**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOONG CHEE MIN, and FRANK J. FISH,

Plaintiffs,

v.

LONGFIN CORP., VENKAT S. MEENAVALLI, VIVEK KUMAR RATAKONDA, AMRO IZZELDEN ALTAHAWI, SURESH TAMMINEEDI, DORABABU PENUMARTHI, and NETWORK 1 FINANCIAL SECURITIES, INC.,

Defendants.

Civ. No. 1:18-cv-10635-DLC

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Loong Chee Min and Frank J. Fish ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of documents and solicitation materials released by Defendants (defined below) in connection with Longfin Corp.'s ("Longfin" or the "Company") initial public offering conducted under Regulation A, and business operations; (b) review and analysis of regulatory filings made by Longfin with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and media reports issued by and disseminated by Longfin; (d) review and analysis of securities analyst reports and advisories about the Company; (e) review and analysis of documents filed in a related civil action pending before this Court entitled *SEC v. Longfin Corp.*, *et al.*, No. 1:18-cv-2977-DLC; and (f) review and analysis of other publicly available information concerning Longfin.

## NATURE OF THE ACTION

1. This action is brought by Plaintiffs seeks to recover damages for violations of the common law of the State of New York and the federal securities laws under Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act" [15 U.S.C. §§ 77l(a)(1) and 77o(a)] (the "Securities Act Claims") and Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] (the "Exchange Act Claims"), against Longfin, Venkata S. Meenavalli ("Meenavalli"), Vivek Kumar Ratakonda ("Ratakonda"), Andy Altahawi f/k/a Amro Izzelden Altahawi ("Altahawi," and together with Meenavalli and Ratakonda, the "Executive Defendants"), Suresh Tammineedi ("Tammineedi"),

Dorababu Penumarthi ("Penumarthi" and together with Meenavalli, Ratakonda, Altahawi, and Tammineedi, the "Individual Defendants"), and Network 1 Financial Securities, Inc. ("Network 1") (collectively, "Defendants").[1] Plaintiffs purchased or otherwise acquired Longfin common stock between December 18, 2017 and December 28, 2017.

2. Longfin purportedly operates as a finance and technology company, and the Company acquired Ziddu.com in December 2017 to enable global trade through the use of blockchain technology.

3. According to the Company's website, Longfin is headquartered in New York, New York, and its Class A Stock was traded under the ticker symbol "LFIN" on the NASDAQ Stock Market ("NASDAQ") from December 13, 2017 until April 6, 2018—when the stock's trading was halted. The Class A Stock resumed trading on the Over the Counter Market ("OTC") on May 24, 2018.

4. The Securities Act Claims are based on Defendants' unlawful solicitation, offer, and sale of unregistered securities in violation of Section 5 of the Securities Act.

5. The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to tout their investment opportunities with no limitations whatsoever. For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its product development, business plan, and business strategies, or even fabricate the existence of relationships with vendors or other business partners (*e.g.*, issuing 2.5 million of a company's

---

[1] Plaintiffs' Section 20A claim is only alleged against Defendant Tammineedi.

publicly traded common stock in a related party transaction to acquire a purportedly valuable asset—which is later revealed to have been valued by the company itself at $0).

6. Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. As detailed herein, none of Longfin's securities have been registered under the Securities Act; therefore, these transactions were made in direct violation of the Securities Act's registration requirements.

7. The Exchange Act Claims are based on Defendants' fraudulent and manipulative scheme to enrich themselves and their affiliates by: (1) creating a public market for Longfin's securities; (2) artificially inflating the Class A Shares' trading price by issuing numerous false or misleading statements of fact, failing to disclose material information to public investors; and (3) unlawfully engaging in insider trades and selling their Class A Shares at artificially inflated prices.

8. For example, Defendants inflated the trading price of Class A Shares by making materially false and misleading statements or omitting material statements of facts concerning, *inter alia*: (i) Longfin's eligibility to list its Class A Stock on NASDAQ; (ii) the location of the Company's principal place of business and compliance with requirements to conduct a public offering under Regulation A; (iii) the number of Class A Shares issued pursuant to the Regulation A Offering; (iv) Longfin's Class A Stock's public float; (v) the Company's acquisition of Ziddu.com from Meridian Enterprises Pte. Ltd. ("Meridian Enterprises") and related party transactions attendant thereto; (vi) Ziddu.com's involvement with blockchain technologies, operational status, and value; (vii) the identities and qualifications of Longfin's

board members, officers, and key employees; (viii) material weaknesses in the Company's internal controls over financial reporting and operations; and/or (ix) the Company's operations and profitability.

9. Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (Class A Shares) which were nothing but a vehicle for the Individual Defendants' personal enrichment. As detailed *infra*, when the magnitude of Longfin's fraudulent conduct was revealed, the trading price of Longfin's Class A Stock plummeted.

10. Defendants' fraudulent and manipulative schemes and false or misleading misrepresentations/omissions were revealed in a series of corrective disclosures.

11. On March 26, 2018, Citron Research ("Citron"), a market commentator, submitted a post via its Twitter account accusing the Company of inaccuracies in its financial reporting and fraud. The same day, Russell issued a statement announcing that Longfin would be removed from its global indices after market close on March 28, 2018, approximately 12 days after the Class A Stock had been added.

12. On March 27, 2018, CNBC published an article entitled "Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index."

13. On April 2, 2018, Longfin filed its annual report on Form 10-K for the Company's 2017 fiscal year (the "2017 10-K"). The 2017 10-K revealed for the first time that Longfin was the subject of an SEC investigation (which led to a court-imposed freeze on $27 million in illicit trading proceeds), suffered from a multitude of material weaknesses in its

internal controls over financial reporting, and was subject to a "going concern" qualification from its auditors.

14. On April 6, 2018, an SEC complaint against Longfin was unsealed and made public, and trading of Longfin's Class A Stock was halted on NASDAQ. On May 5, 2018, the SEC filed an amended complaint against Longfin, Meenavalli, Altahawi, Tammineedi, and Penumarthi. The amended SEC complaint is appended hereto as Exhibit A, and is incorporated by reference. On May 14, 2018, Longfin voluntarily delisted its Class A Stock from NASDAQ by filing a Form 25 with the SEC.

15. On May 24, 2018, the Company's Class A Stock was officially delisted from NASDAQ. The same day, the Class A Stock began trading on the OTC, with an opening price of $5.05.

16. Defendants' fraudulent and manipulative conduct, and false or misleading statements and omissions caused the Class A Stock's trading price to surge to $142.82 on December 18, 2017, only to decline 96.46% to an opening price of $5.05 on May 24, 2018—the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

17. As a result of Defendants' fraudulent conduct alleged herein, Plaintiffs invested in Longfin securities and suffered significant financial harm. For these reasons, Plaintiffs seek to recover monetary damages for the harm caused by the wrongful conduct set forth herein.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as Section 12(a)(1) and 15(a) of the Securities Act (15 U.S.C. §§ 77l(a)(1) and 77o(a)).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v). This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

20. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and Section 22 of the Securities Act (15 U.S.C. § 77v). A significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District. Additionally, Longfin claimed its principal executive offices were located within this Judicial District, and Defendants received substantial compensation by doing business in this District.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, the Internet, and the facilities of NASDAQ (a national securities exchange in this District).

## PARTIES

### I. PLAINTIFFS

22. Plaintiff Loong Chee Min ("Min") purchased 11,000 shares of Longfin stock on December 19, 2017 and 6,300 shares on December 28, 2017 and suffered damages as a result of the violations of the common law of the State of New York, federal securities laws, and false and/or misleading statements and/or material omissions alleged herein.

23. Plaintiff Frank J. Fish made multiple purchases of Longfin stock on December 18, 2017, for a total of 30,000 shares and suffered damages as a result of the violations of the common law of the State of New York, federal securities laws, and false and/or misleading statements and/or material omissions alleged herein.

## II. DEFENDANTS

24. Defendant Longfin is incorporated in Delaware and purportedly maintains its headquarters in New York, New York. Longfin's common stock traded on the NASDAQ under the symbol "LFIN" from December 13, 2017 through April 6, 2018, when trading was suspended. On May 14, 2018, the Company voluntarily delisted its stock by filing a Form 25 with the SEC. The delisting was effective on May 24, 2018, and the stock began trading on the OTC on the same day.

25. Defendant Meenavalli was the Chairman and Chief Executive Officer ("CEO") of Longfin at all relevant times, as well as the founder of the Company. Meenavalli is a citizen of India and a resident of Singapore. Meenavalli controls well over 50% of the Company's voting equity. Meenavalli and his wife own 17% of the voting stock of Stampede Capital Limited ("Stampede") which owns approximately 27.6% of Longfin's voting equity.

26. Defendant Ratakonda was Longfin's Chief Operating Officer until on or about December 11, 2017, on which date Longfin accepted the resignation of its prior Chief Financial Officer ("CFO") and appointed Ratakonda as the Company's new CFO. Ratakonda has thus served as the Company's CFO at all relevant times. That same day, Ratakonda executed a waiver approving the Company's purchase of Ziddu.com. Ratakonda served as a director of Stampede Capital Ltd. from 2012 until February 2018.

27. Defendant Altahawi is a resident of Sunny Isles Beach, Florida and the president and majority owner of Adamson Brothers Corp. Altahawi, through Adamson Brothers Corp., operates ipoflow.com which claims to be a "pioneer in Regulation A+ offerings" and a "leading equity Reg A+ offering platform opening up the IPO access to everyone." Adamson Brothers Corp. is an alter ego of Altahawi which he uses to, for all intents and purposes, serve as an

unregistered broker-dealer purportedly specializing in Regulation A offerings. Altahawi has been employed with various registered broker-dealers. Altahawi became Longfin's Secretary in June 2017 and continued, whether officially or unofficially, until at least late-December 2017.

28. Defendant Tammineedi is a citizen of India residing in Hyderabad, India. Tammineedi and Meenavalli are affiliated through various business entities. For example, Tammineedi was a director of Stampede Capital Limited (which owns approximately 27.6% of the Company's voting stock). Additionally, until February 2018, Tammineedi was a director of Longfin's subsidiary, Longcom India Pte. Ltd. (f/k/a Longhash Commodity Trading Pte. Ltd.). Tammineedi and Meenavalli have also both served as directors of Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

29. Defendant Penumarthi is a citizen and resident of the United Kingdom. Penumarthi's Facebook page has previously stated that he was employed as the "head of Longfin's United Kingdom operations." Additionally, Penumarthi and Meenavalli are affiliated through Smartahead Solutions Limited, a United Kingdom-based entity where Penumarthi and Meenavalli served together as directors until Meenavalli resigned in June 2013. Penumarthi is currently the sole director at Smartahead Solutions Limited.

30. Defendant Network 1 is a subsidiary of Network 1 Financial Group, Inc. Network 1 is a registered broker-dealer and its main office is located in Red Bank, New Jersey. Network 1 was engaged as Longfin's Lead Underwriter in connection with the Company's Regulation A Offering. Longfin's primary points of contact at Network 1 were Damon D. Testaverde and Keith J. Testaverde, both of whom have operated out of Network 1's Red Bank office for over a decade. Altahawi was registered as a broker-dealer in Network 1's Red Bank Office from 2014-2015.

31. Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein; (iv) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (v) approved or ratified these statements in violation of the common law of the State of New York and federal securities laws.

32. Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Longfin's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations and performance), conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof and review of reports and other information provided to them in connection therewith.

33. As officers of a publicly-held company whose securities were registered with the SEC pursuant to Section 12(b) of the Exchange Act, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

The Individual Defendants' misrepresentations and omissions, as alleged herein, violated these specific requirements and obligations.

34. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Longfin's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Longfin's business, operations, and management, as well as the intrinsic value of Longfin securities; and (ii) caused Plaintiffs to purchase Longfin securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### I. THE REGULATION A OFFERING

35. Longfin was incorporated in Delaware on February 1, 2017. The Company also entered into an agreement with Altahawi's company, Adamson Brothers Corp., on the same day. The agreement provided for Altahawi/Adamson Brothers to receive "3% equality [sic] of the company's outstanding shares pre-offering" in exchange for assisting the Company in drafting a Regulation A Tier 2 offering of up to $50 million of Longfin's securities.

36. Regulation A allows exemptions from Section 5's registration requirements, lowering the costs and requirements of the offering. To qualify, the issuer must file a Form 1-A Offering Statement with the SEC, which must then be qualified by the SEC. The terms of the Offering Statement apply to the securities sold pursuant to it once it is qualified by the SEC.

37. Regulation A has two types of offerings which allow for the Rule 5 exemption: Tier 1 and Tier 2. A Tier 2 offering may expedite trading by registering under Section 12(b) of the Exchange Act (15 U.S.C. § 78l), complying with the reporting requirements of the Exchange Act and the eligibility requirements for an initial listing on a public exchange.

38. On March 10, 2017, Longfin filed a Form 1-A announcing that it was seeking to qualify for a Tier 2 offering under Regulation A. It stated that Altahawi/Adamson would receive the 3% of the issued shares "after the successful completion of fund raising." The Form 1-A also noted that the Company entered into an agreement with Stampede Tradex Pte Ltd. ("Stampede") pursuant to which Longfin would provide 100 million shares of Longfin's common stock to Stampede's owners (*i.e.*, 55% to Stampede Capital Limited and 45% to Meenavalli).

39. Meenavalli's ownership interest in Stampede was not disclosed in the Form 1-A. Stampede was subsequently renamed Longfin Tradex Pte Ltd. and its February 2017 audited financial statement was attached to the Form 1-A. This was the only audited financial statement provided for Longfin during the offering until the Company filed its 2017 10-K on April 2, 2018.

40. The Company filed amended Form 1-A's on March 13, 2017, April 18, 2017, May 12, 2017, May 22, 2017, and May 23, 2017.

41. In June 2017, Altahawi's daughter began working for Longfin and leased shared office space in New York and opened bank accounts in the Company's name.

42. Altahawi was named Longfin's Secretary in June 2017 and on June 15, 2017 amended the Company's by-laws to divide Longfin's common stock into 100 million shares of Class A Stock, 75 million share of Class B common stock, and 25 million shares of Class C common stock. Class A Stock received 1 vote per share and Class B common stock received 10 votes per share; whereas, Class C common stock did not have voting rights. The following day, June 16, 2017, the SEC qualified Longfin's May 23, 2017 Amended Form 1-A, which provided for an offering of 10 million shares of Class A Stock for $5.00 per share.

43. Shortly thereafter, on June 19, 2017, Longfin consummated its transaction to acquire Stampede, providing Meenavalli 22.5 million shares of Class B common stock and

Stampede Capital Limited, 27.5 million shares of Class A Stock. Stampede thereafter became a wholly-owned subsidiary of Longfin.

44. The Company received a signed engagement letter from Network 1 in late June 2017 to serve as the lead underwriter for the Tier 2 Regulation A Offering. The Underwriting Agreement, dated August 21, 2017, was attached to the Company's August 31, 2017 fourth amendment to its Post-Qualification Offering Circular ("POS").

45. On August 11, 2017, Longfin filed its application for listing on NASDAQ. Network 1 and Altahawi were primarily responsible for communicating with NASDAQ regarding the Company's application.

46. On September 1, 2017, the Company issued 31,775 shares under its Regulation A Offering to 36 individuals, who Meenavalli claimed were employees, despite the fact that the offering had yet to be qualified by the SEC and thus was not registered.

47. Altahawi and a member of Longfin's board of advisors granted the Company's former CFO 3,375,000 shares of Class A Stock, and an additional grant of 2,025,00 shares of Class A Stock to Altahawi on September 15, 2017.

48. The Company's final POS was filed November 3, 2017, and was qualified by the SEC on November 22, 2017, for a Tier 2 Regulation A Offering of up to 10 million Class A Shares for $5.00 per share and a minimum purchase of 100 shares.

49. NASDAQ Listing Rule 5505(a) requires a Company to have at least 1,000,000 publicly-held shares and a minimum of 300 round lot holders, in addition to a market value of the publicly-held shares of at least $5 million.

50. NASDAQ Listing Rules 5005(a) defines "Publicly Held Shares" as "shares not held directly or indirectly by an officer, director, or any person who is the beneficial owner of

more than 10 percent of the total shares outstanding. Determinations of beneficial ownership in calculating publicly-held shares shall be made in accordance with Rule 13d-3 under the Act;" and a "Round Lot Holder" as "a holder of a Normal Unit of Trading [100 shares]" but that the "number of beneficial holders will be considered in addition to holders of record."

51. The November 3, 2017 POS noted the NASDAQ listing requirements, stating:

> We anticipate the shares of our common stock will be listed on the Nasdaq Capital Market (under Net Income Standard) under the symbol "LFIN". In order to list, the Nasdaq Capital Market requires that, among other criteria, at least 1,000,000 publicly-held shares of our common stock be outstanding, the shares be held in the aggregate by at least 300 round lot holders, the market value of the publicly-held shares of our common stock be at least $5 million, our stockholders' equity after giving effect to the sale of our shares in this offering be at least $4 million, the bid price per share of our common stock be $4.00 or more, and there be at least three registered and active market makers for our common stock.

52. NASDAQ approved Longfin's application on November 15, 2017. Altahawi emailed NASDAQ on November 29, 2017, copying Meenavalli, to inform them that the Company intended to close the offering on December 6, 2017, and list its Class A Stock on December 11, 2017.

53. On December 4, 2017, Network 1 requested updated information on issuances pursuant to the Regulation A Offering for its communications with NASDAQ regarding Longfin's proposed listing on December 11, 2017. Longfin's transfer agent, following Altahawi's instructions, provided Network 1 with a list of issuances made pursuant to the Tier 2 Regulation A Offering and a reconciliation printout showing the deposits received for these purchases along with their remittances.

54. On December 6, 2017, Longfin had not reached the NASDAQ listing requirement of 1 million shares of publicly-held Class A Stock. The Company's control log revealed that it

purported to issue 67,725 Class A Stock to 261 individuals between September 1, 2017 and December 6, 2017.

55. In order to meet the requirement, Meenavalli and Altahawi caused Longfin to issue 409,360 Class A Shares (the "December 6 Shares") to 24 individuals (the "December 6 Shareholders") for-$0. That afternoon, Altahawi emailed Longfin's escrow agent, copying Meenavalli, stating "I need to submit 24 subscriptions we need to issue the shares for as of today please." At approximately 4:09 p.m., Altahawi sent the escrow agent subscription agreements for each of the December 6 Shareholders. A couple hours later, the transfer agent informed Altahawi and Meenavalli that the issuances were complete. Altahawi then informed NASDAQ that the offering would close on December 7, 2017, and requested a listing date of December 13, 2017.

56. Among the 24 individuals granted the December 6 Shares for free were: 1) Defendant Tammineedi, former director of Stampede Capital Limited and executive director of Longfin's subsidiary Longcom India Pte. Ltd. until February 2018; 2) Defendant Penumarthi, head of Longfin's United Kingdom operations; 3) Defendant Ratakonda, Longfin's CFO and two of his family members; 4) Gaddi Linga Murthy, Longfin's Chief Technology Officer; 5) Emmanuel Dasi, Longfin's Chief Information Officer and Stampede Capital Limited's former CIO; 6) Prathipati Parthasarathi, Stampede Capital Limited's former CFO and Executive Director; 7) Karimgam Avinash, Stampede Capital Limited's former Executive Director; 8) Satya Srikanth Karaturi, Director of Spacenet Enterprises India Limited, Kling Enterprises India Limited, and Stampede Enterprises India Private Limited; and 9) Vasudeva Rao Maraka, Director of Operations for Meridian Tech Pte. Ltd.

57. Longfin violated the terms of its qualified Offering Statement by selling its Class A Shares for $0 per share, rather than $5.00 per share, thus foregoing the Regulation A exemption. Furthermore, none of the shares were "publicly-held" according to NASDAQ's listing requirements.

58. On December 7, 2017, Altahawi emailed Network 1 an updated shareholder list which included the December 6 Shareholders. Network 1 replied, asking Altahawi to provide confirmation of "the list of people that invested in the raise before our deal and proof of Funds received." Altahawi responded with a list of the 24 December 6 Shareholders and bank statements which purportedly contained payment information.

59. Network 1 knew or should have known that the December 6 Shareholders were affiliated with the Company; and therefore, that the shares were not "publicly held."

60. On December 11, 2017, Altahawi provided NASDAQ a final list of shareholders, indicating that they had sold 1,140,989 Class A Shares between September 1, 2017 and December 11, 2017 to 364 shareholders, pursuant to its Tier 2 Regulation A Offering. Two days later, on December 13, 2017, Longfin's Class A Shares were listed on NASDAQ under the ticker symbol "LFIN."

61. Shortly thereafter, on or about December 21, 2017, seven of the December 6 Shareholders, including Defendants Tammineedi and Penumarthi, asked Network 1 to open brokerage accounts. Network 1 asked Altahawi to confirm that payment had been received for these shares and Altahawi provided the bank statements as confirmation of payment. However, as indicated in *SEC v. Longfin Corp., et al.*, No. 1:18-cv-2977-DLC, Dkt. No. 43-1, ¶ 44 (the "SEC Complaint"), the bank statements did not in fact provide evidence of payment. The SEC Complaint states that the escrow account used in the Regulation A Offering and Longfin's PNC

Bank account did not contain "evidence of payments for the shares issued on December 6, 2017 or around the time that subscription agreements were signed by [the December 6 Shareholders]." As a result, Network 1 knew or was reckless in not knowing that the December 6 Shares were not lawfully issued under the Regulation A Offering.

62. The Underwriting Agreement provided for Network 1 to receive 7% commission on the proceeds of the first 3 million shares sold in the Regulation A Offering; however, Network 1 received $438,757 for 1,140,989 shares sold, or 38% commission. Network 1's commission was not only greater than 7%, but it was also based on an inclusion of the 409,360 December 6 Shares which were not issued pursuant to the Regulation A Offering.

## II. TAMMINEEDI'S INSIDER TRADES

63. Defendant Tammineedi's company, Source Media, purchased 67,000 shares of Longfin on the open market for an average of $5.48 per share on December 13 and December 14, 2017. Within days of the listing, Longfin's share price skyrocketed due to its false and misleading statements regarding its acquisition of the blockchain technology platform Ziddu.com. A few days after Longfin issued a false and misleading press release regarding its acquisition of Ziddu.com on December 14, 2017, Tammineedi sold these shares reaping approximately $2.7 million in profits. Meenavalli was copied on Tammineedi's emails regarding the brokerage account he opened to deposit these shares and execute these transactions.

64. Tammineedi's purchases and sales were made on the basis of undisclosed inside information. Tammineedi was an executive employee at Longfin who had a duty to refrain from executing these trades or to disclose the inside information publicly. Tammineedi's failure to do so constitutes a material omission of material fact. The material non-public information Tammineedi failed to disclose included that: (a) Longfin was not headquartered in New York; (b) Longfin's Regulation A Offering was a sham, and none of the shares it issued were actually

issued pursuant to the Regulation A Offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (c) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (d) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (e) Longfin had material weaknesses in its operations and internal controls over financial reporting; (f) Longfin's purported public float was severely inflated by the unregistered non-exempt Class A Stock Defendants illegally introduced into the public market and numerous Class A Shares held by Defendants' affiliates; and (g) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

## III. MATERIALLY FALSE AND MISLEADING STATEMENTS

65. On December 11 2017, just two days prior to the listing of Longfin's Class A Stock on NASDAQ, Longfin's directors accepted the resignation of the Company's former CFO and COO and appointed Ratakonda as CFO. Additionally, the members of the Board, including Defendant Ratakonda, approved Longfin's acquisition of Ziddu.com from Meridian Enterprises for 2.5 million Longfin Class A Shares. Meenavalli was believed to have owned approximately 92% of Meridian Enterprises at the time of this transaction.[2]

66. On December 13, 2017, Longfin's Class A Stock opened at a price of $6.94 per share and closed at $5.17 per share. That same day, at 10:00 AM EST, the Executive Defendants caused the Company to publish a press release stating in pertinent part:

[2] On July 27, 2018, Meenavalli filed a Form 4 with the SEC stating: (a) Meenavalli had a 97.58% ownership interest in Meridian Enterprises when the Ziddu.com acquisition occurred; (b) following the Ziddu.com acquisition, through his ownership in Meridian Enterprises, he had a pecuniary interest in 2,097,970 Class A Shares; and (c) that on July 23, 2018 and July 25, 2018, he sold approximately 92.67% of that interest (carrying a pecuniary interest in 965,515 Class A Shares) in exchange for $5,900,608. Notably, this is was the first Form 4 ever filed on the SEC's Edgar Database.

New York, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (NASDAQ: LFIN), a leading global FinTech company, announces that it will be traded on the Nasdaq market for the first day after its initial public offering (IPO) under Reg A+ closing on December 8, 2017.

"We are delighted to be the first FinTech company went public through Reg A+ on the Nasdaq market," commented Mr. Meenavalli, Chairman and CEO of Longfin. "We acknowledged the Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, like us, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."

* * * *

About Longfin Corp.
Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

67. Also on December 13, 2017, the Executive Defendants caused the Company to publish another press release at 3:35 EST, stating:

NEW YORK, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (Nasdaq: LFIN), a leading global FinTech company powered by Artificial Intelligence (AI) and Machine Learning, visited the Nasdaq MarketSite in Times Square today in celebration of its initial public offering (IPO) on The Nasdaq Stock Market.

According to a research report of Asian Development Bank (ADB), in 2016, the global trade finance gap is $1.5 trillion. Access to finance is the biggest challenge to small and medium enterprises in developing countries and other frontier markets. Powered by Artificial Intelligence (AI) and Machine Learning, Longfin delivers foreign exchange and finance solutions to importers/exporters and SMEs. Its presence in the world's leading markets enables them to offer clients access to nuances of the local markets while providing gateway to the global markets.

"We are delighted to be the first FinTech company went public through Reg A+ on Nasdaq," commented Mr. Meenavalli, Chairman and CEO of Longfin. "We acknowledged Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, such as ourselves, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."

"India's innovation-driven growth has been unprecedented. Its economy boosts transformation within the country and contributes to global development." said Bob

> McCooey, Senior Vice President, Nasdaq. “As the 2nd IPO completed on Nasdaq by an Indian company since 2010, Longfin embodies the can-do spirit like many entrepreneurs of Nasdaq listed companies. We are excited to partner with them as they continue to grow.”
>
> About Longfin Corp.
> Longfin (“LFIN”) is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

68. The December 13, 2017 press releases were materially false and misleading at the time that they were published, because they concealed and omitted the material fact that Longfin had obtained its NASDAQ listing under false and fraudulent pretenses, and Longfin’s Class A Stock was actually ineligible for listing on NASDAQ. Specifically, the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a) as described in paragraph 49, *supra*. Indeed, the December 13, 2017 press releases were further materially false and misleading because they omitted and concealed the material facts that: (a) the Company’s entire Regulation A Offering was a sham and all publicly-held or traded shares of Class A Stock were issued in non-exempt transactions involving unregistered securities and had been sold to the public improperly and without properly observing the requirements of Regulation A—such as Regulation A’s requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; and (c) Longfin was not “a US-based, global fintech company powered by artificial intelligence (AI) and machine learning.”

69. Additionally, the December 13, 2017 press releases were materially false and misleading because the Company had not actually operated out of the United States – let alone New York, as indicated. Indeed, as reported by in *The Wall Street Journal*, on April 3, 2018, the so-called "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment.

70. On December 15, 2017, the Executive Defendants caused Longfin to issue a press release entitled "Longfin Corp acquires Blockchain empowered Global Micro-lending solutions provider Ziddu.com" (the "December 15 Press Release"). This press release stated, in relevant part:

> New York, NY (December 14, 2017) - Longfin Corp. (LFIN:Nasdaq) announces the acquisition of Ziddu.com, a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents.
>
> Ziddu Warehouse Coin is a smart contract that enables Importers and Exporters to use their Ziddu coins that are loosely pegged to Ethereum and Bitcoin Crypto Currency. The Importers/Exporters convert offered Ziddu coins into Ethereum and Bitcoin Cryptocurrencies and use the proceeds for their working capital needs.
>
> "The advent of Blockchain technology has caught the imagination of the global financial services industry; blockchain is emerging as a technological revolution that we believe is set to disrupt the financial services infrastructure. Crypto currencies such as Bitcoin and Ethereum are expected to act as a global financing currency to avail credit against hard currencies of many emerging markets." Says Venkat Meenavalli, Chairman of Longfin Corp.
>
> Ziddu intends to use blockchain technology to transform the lives of millions of SME's by providing finance by way of Ziddu coins and through Crypto Currencies such as Ethereum and Bitcoin against their collateralized warehouse receipts. At the end of the contract, Importers/Exporters are expected to realize their proceeds and pay back their funds through Crypto Currencies only. Depending upon the risk profile of the counterparty, the interest will vary between 12% to 48%.

71. The December 15 Press Release was filed as part of a Form 8-K Longfin filed on December 15, 2018 (the "Ziddu.com 8-K," and together with the December 15 Press Release, the "Ziddu.com Announcements").

72. The Ziddu.com Announcements contained almost entirely false or misleading representations at the time that they were made. In fact, the Ziddu.com acquisition and its announcement were the by-product of Defendants' manipulative and fraudulent scheme to artificially inflate the Class A Stock's trading price by preying on the investing public's newly found interest in blockchain technology. In essence, Longfin deceived public investors into believing that it had acquired a valuable asset related to virtual currencies—frequently referred to as cryptocurrencies—and that such asset had already been operating as a provider of "Blockchain technology empowered solutions."

73. Importantly, the Ziddu.com Announcements were issued at a time when trading prices for virtual currencies had reached all-time record highs across the board. For example, the trading price of Bitcoin ("BTC")—the most commonly known virtual currency—surged from approximately $900 per BTC in January 2017 to approximately $20,000 per BTC in December 2017, an increase of approximately 11,000%. Naturally, the investing public quickly became interested in virtual currencies, blockchain technologies, and any potential opportunities to invest in the nascent industry.

74. Defendants deceptively preyed on this new-found attention with the Ziddu.com Announcements. For example, the title of the December 14 Press Release describes Ziddu.com as a "Blockchain technology empowered solutions provider." Similarly, Meenavalli is quoted therein discussing the so-called "blockchain revolution" set to "disrupt the financial services infrastructure." The foregoing was clearly designed to convince the investing public that

Ziddu.com was already operating as a "provider" of blockchain related services. Such statements were deceptive given that neither Longfin nor Ziddu.com had any operations concerning, prior experience in, or involvement with blockchain technology. In fact, Longfin's acquisition was merely an acquisition of assets such as the domain www.ziddu.com, Ziddu.com's social media accounts, and its trademarks.

75. The Ziddu.com Announcements also deceived the investing public with their description of the "Ziddu Warehouse Coin" (the "Ziddu Coin") which purportedly had a value "loosely pegged" to Bitcoin and Ethereum. This representation misled investors into believing that the value of Ziddu.com had some correlation to the value of BTC and Ethereum, both of which experienced exponential growth in recent months. In reality, the Ziddu Coin has never had any value—let alone a value pegged to BTC or Ethereum.

76. As revealed in Longfin's Form 10-K annual report filed on April 2, 2018 (the "2017 10-K"), Ziddu.com had no value whatsoever at the time of its acquisition. Indeed, Longfin recorded Ziddu.com's value as $0—a fact which unquestionably would have been material to Longfin investors when the acquisition was announced. However, such information was not revealed until the filing of the 2017 10-K, which stated:

> On December 11, 2017, the Company issued 2,500,000 shares of its Class A Common Stock in connection with the purchase of the website www.Ziddu.com and all of its respective content and intellectual property rights (the "Ziddu"), from Meridian Enterprises Pte. Ltd., ("Meridian") a company owned 92% by Mr. Meenavalli. ***The acquisition of the Ziddu has been accounted for as an asset acquisition between entities under common control and was recorded at Meridian's historical carrying value of $0 (zero).*** The website and related content and intellectual property comprised substantially all of the value acquired. ***Meridian had not recognized revenue related to Ziddu historically***.

(Emphasis added).

77. Accordingly, Longfin's representations relating to the Ziddu.com acquisition were false and/or misleading.

78. Additionally, the Ziddu.com Announcements referenced the fact that Longfin's Class A Shares were traded on NASDAQ under the ticker symbol LFIN. However, the Ziddu.com Announcements were rendered materially misleading because they concealed and omitted the material fact that Longfin had obtained its NASDAQ listing under false and fraudulent pretenses, and Longfin's Class A Stock was actually ineligible for listing on NASDAQ. Specifically, the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a) as described in paragraph 49, *supra*.

79. In the days following issuance of the Ziddu.com Announcements, the price of Longfin's Class A Stock increased from $5.39 per share on December 14, 2017, to $142.82 on December 18, 2017, representing an increase of more than 2,500% in just three trading days, due to Longfin's fraudulent and manipulative conduct and false or misleading statements and omissions.

80. Thereafter, the price of Class A Stock precipitously declined, eventually falling 96.46% to an opening price of $5.05 on May 24, 2018 – the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

## IV. ADDITIONAL INSIDER SALES OF UNREGISTERED LONGFIN CLASS A STOCK MADE SUBSEQUENT TO PLAINTIFFS' STOCK PURCHASES

### A. Altahawi Sells 536,103 Shares Of Unregistered Non-Exempt Longfin Class A Stock On The Open Market For A Profit Of $29,016,156.34

81. On January 12, 2018, Altahawi entered into a share purchase agreement with ten of the December 6 Shareholders, including two of Ratakonda's family members and Tammineedi, for $30.00 per share for 121,000 Class A shares (the "Private Transaction"). Each

of the ten December 6 Shareholders' signatures were on the same agreement. The transfer agent contacted Meenavalli to confirm whether they should conduct the transfer and Meenavalli approved the transfer.

82. These shares were not exempt from registration requirements, and therefore, could not legally be sold on the open market because they were issued for $0 per share, rather than $5 per share, as required by the Regulation A Offering.

83. As noted above, in September 2017, Altahawi issued himself 2,025,000 shares of Class A Stock (the "Consulting Shares") prior to the completion of the Regulation A Offering, contrary to the terms of the consulting agreement which required the Regulation A Offering to be complete before Altahawi received this compensation.

84. The Consulting Shares had a restrictive legend which would not be lifted until a year after the date they were fully earned or issued, which would be in either June 2018 if it were based on the first qualification in June 2017 or December 2018 if it were based on the close of the Regulation A Offering in December 2017.

85. In or around late February 2018 or early March 2018, Altahawi attempted to deposit the Consulting Shares, but the transaction was denied due to the restrictive legend. In response, Meenavalli, requested that Longfin's transfer agent remove the restrictive legend indicating that Altahawi had fully earned the shares in February 2017. The transfer agent complied with Meenavalli's request allowing Altahawi to deposit the shares. This transaction gave Altahawi control of over 60% of the public float.

86. Between February 8, 2018 and March 29, 2018, Altahawi sold 536,103 Longfin shares on the open market for a profit of approximately $29,016,156.34. These sales were not

exempt from registration requirements, and therefore, were also in violation of Section 5 of the Securities Act.

87. During this same time period, Altahawi placed numerous wash trades to artificially inflate LFIN's stock price. Below is an example of Altahawi's manipulative trading:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LFIN | 2018-03-22, 10:44:07 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 10:44:12 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:44:39 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 10:52:36 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 10:52:46 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 10:54:48 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:56:12 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 11:14:55 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 11:16:10 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:18:42 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 11:20:01 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:20:08 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |

88. Altahawi sold these shares while in possession of material non-public information which Altahawi had a duty to disclose or abstain from trading.

**B. Tammineedi Sells 2,200 Of The Unregistered Non-Exempt December 6 Shares For A Profit Of $127,335**

89. Tammineedi received 30,000 of the December 6 Shares at no cost, and therefore, these share were not exempt from registration requirements because the shares were not issued pursuant to the Regulation A Offering, which required shares to be sold at $5.00 per share.

90. Tammineedi sold 2,200 of the December 6 Shares on the open market in February and March of 2018 for a profit of $127,335. These sales were in violation of Section 5 of the Securities Act.

91. Tammineedi sold these shares while in possession of material non-public information which Tammineedi had a duty to disclose or abstain from trading.

### C. Penumarthi Sells 39,200 Of The Unregistered Non-Exempt December 6 Shares For A Profit Of $1,531,187.39

92. Penumarthi received 40,000 of the December 6 Shares at no cost, and therefore, these share were not exempt from registration requirements because the shares were not issued pursuant to the Regulation A Offering, which required shares to be sold at $5.00 per share.

93. Penumarthi sold 4,000 of the December 6 Shares on the open market on January 23, 2018, for a profit of approximately $169,495 and later sold an additional 35,800 of the December 6 Shares for a profit of approximately $1,361,692.39. These sales were in violation of Section 5 of the Securities Act.

94. Penumarthi sold these shares while in possession of material non-public information which Penumarthi had a duty to disclose or abstain from trading.

## V. THE TRUTH EMERGES IN STAGES

95. Effective March 16, 2018, Longfin was added to the Russell indices as part of Russell's quarterly addition of companies with recent initial public offerings. This addition significantly increased investor demand for Longfin securities.

96. On March 26, 2018, market commentator, Citron, used its Twitter account to post the following statement accusing Longfin of inaccuracies in its financial reporting and fraud: "If you are fortunate enough to get a borrow, indeed $LFIN is a pure stock scheme.

@sec_enforcement should not be far behind. Filings and press releases are riddled with inaccuracies and fraud."

97. The same day, Russell issued a statement entitled "Longfin Corp (USA): Constituent Deletion Changes in Russel Global Index Series," which stated:

> Longfin (USA, constituent) was included as an IPO in the Russell 2000 index at the March quarterly update on the basis of its IPO filing of 3 November 2017 which stated that up to 10,000,000 Class A common shares would be offered. Subsequently, an SEC filing published on 13 February 2018, immediately prior to the Russell US Index rank date of 14 February 2018 for the quarterly IPO additions, confirmed that up to a maximum of 1,140,000 of the shares offered had been taken up by the public. Consequently FTSE Russell has determined that Longfin failed to meet the minimum 5% free float requirement as at the 14 February rank date. In accordance with the FTSE Russell Recalculation Policy and Guidelines, Longfin will therefore be removed from the Russell Indexes on 28 March 2018 (after the close).

98. On this news, the trading price of Longfin's Class A Stock declined from $59.28 per share on March 26, 2018 to close at $34.68 per share on March 27, 2018, a decline of more than 41%, on abnormally large volume.

99. On March 27, 2018, *CNBC* published an article entitled "Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index." This article, in relevant part, quotes Meenavalli's response as follows:

> "We are reapplying" for inclusion in the indexes, Longfin CEO Venkat Meenavalli told CNBC in a phone interview Tuesday. He said the stock's free float has increased above the minimum 5 percent as of March 11 due to the expiration of a lockup period on a consultant's stock holdings. As for Citron's negative view, "we are going to take legal action after we file the 10-K" in the next three days, Meenavalli said. "The company is a profitable company, making revenue."

100. On this news, the trading price of Longfin's Class A Stock declined from $34.68 per share on March 27, 2018 to close at $17.26 per share on March 29, 2018, a decline of more than 50%, on abnormally large volume.

101. After market close, on April 2, 2018, Longfin filed its 2017 10-K, which revealed for the first time, *inter alia*, that Longfin: (i) had material weakness in its internal control over financial reporting; (ii) was the subject of an SEC investigation concerning its initial public offering and acquisition of Ziddu.com; and (iii) may not be able to continue as a going concern. The 2017 10-K stated, in relevant part:

> ***We have identified several material weaknesses in our internal control over financial reporting. If our planned remediation of these material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control over financial reporting in the future, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the value of our securities.***
>
> In connection with the audit of our financial statements beginning on page F-1, the Company identified several material weaknesses in its internal control over financial reporting. A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis. Below are the material weaknesses identified:
>
> • the Company lacks qualified personnel who fully understand GAAP reporting requirements, possess appropriate skills to identify and determine proper accounting for new, complex or unusual transactions or have a proficiency in the SEC reporting environment;
>
> • the Company did not maintain sufficient personnel with the technical knowledge and skills to perform accounting functions for complex/nonrecurring transactions and financial reporting functions;
>
> • the Company exhibited an overall lack of sufficient knowledge, organized and sufficient audit support, documented positions and assessments, and policies/procedures related to the accounting treatment for both complex and non-complex transactions;
>
> • certain segregation of duties issues exist (i.e., the same person performs the process and the control in certain areas);
>
> • the Company does not have any formal or documented accounting policies and procedures, including with respect to intangible assets and monitoring related parties;

• senior financial reporting personnel have the ability to make journal entries; and

• there is no formal review process around journal entries recorded.

Neither we nor our independent registered public accounting firm has performed an evaluation of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. In light of the material weaknesses that were identified, we believe that it is possible that additional material weaknesses and control deficiencies may have been identified if such an evaluation had been performed.

The Company is working to remediate the material weaknesses, has taken steps to enhance the internal control environment, and plans to take additional steps to remediate the material weaknesses. Specifically, we will:

• seek technically competent staff with appropriate experience applying GAAP accounting guidance and are currently utilizing a consultant with US GAAP/SEC experience to assist with financial reporting requirements;

• design additional controls around identification, documentation and application of technical accounting guidance; implement additional internal reporting procedures, including those designed to add depth to the review processes and improve segregation of duties; and

• restructur[e] internal controls to eliminate or improve known control issues.

The actions that we are taking are subject to ongoing senior management review as well as audit committee oversight. Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our efforts may not be successful in remediating these material weaknesses. In addition, we will incur additional costs in improving our internal control over financial reporting. If we are unable to successfully remediate these material weaknesses or if we identify additional material weaknesses, we may not detect errors on a timely basis. This could harm our operating results, cause us to fail to meet our SEC reporting obligations or NASDAQ Capital Market listing requirements on a timely basis, adversely affect our reputation, cause our stock price to decline or result in inaccurate financial reporting or material misstatements in our annual or interim financial statements.

In addition to the remediation efforts related to the material weaknesses described above, we are in the process of designing and implementing the internal control over financial reporting required to comply with Section 404 of the Sarbanes Oxley Act. This process will be time consuming, costly and complicated. If during the evaluation and testing process, we identify one or more other material weaknesses in our internal control over financial reporting, our management will be unable to assert that our internal control over financial

reporting is effective. Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may conclude that there are material weaknesses with respect to our internal controls or the level at which our internal controls are documented, designed, implemented or reviewed. If we are unable to assert that our internal control over financial reporting is effective, or when required in the future, if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our securities could be adversely affected, and we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, which could require additional financial and management resources.

* * *

**Going Concern**

The Company has limited operating history and experienced a net loss of $26.4 million since its inception. The Company has $2.1 million of cash at December 31, 2017. The Company operates primarily in structured trade finance and providing technology services and our operating costs are primarily related to the cost of providing those services, employee compensation and administrative expenses.

On January 22, 2018, pursuant to a Securities Purchase Agreement (“SPA”) entered into by an institutional investor (the “Investor”), the Company agreed to sell and issue (1) (i) Senior Convertible Notes to the Investor in the aggregate principal amount of $52,700,000 (each, a “Note” and collectively, the “Notes”), consisting of a Series A Note in the principal amount of $10,095,941 and (ii) a Series B Note in the principal amount of $42,604,059, and (2) a warrant to purchase 751,894 shares of Longfin Class A Common Stock, exercisable for a period of five years at an exercise price of $38.55 per share (the “Warrant”), for consideration consisting of (i) a cash payment of $5,000,000, and (ii) a secured promissory note payable by the Investor to Longfin (the “Investor Note”) in the principal amount of $42,604,059 (collectively, the “Financing”). On February 13, 2018, the Company completed the Financing and related sale and issuance of the Notes, the Warrant and a placement agent warrant. The maturity date of the Notes is August 13, 2019 and the Investor Note is February 13, 2048. To date, the Company has received $3.7 million in net proceeds ($5.0 million net of costs of $1.3 million) related to the Financing and will not be able to obtain additional monies through the Financing until the Company files a Registration Statement to register the common shares underlying the Notes and Warrant and such Registration Statement is declared effective by the Securities and Exchange Commission or such shares are eligible for resale pursuant to Rule 144 under the Securities Act, or the investor elects to convert or exercise such securities

notwithstanding the underlying shares have not been so registered or are then so eligible.

***The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations.*** These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going concern. Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis. If the Company is unable to obtain the monies from the Financing, it would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations. These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

* * *

***Legal Matters***

The Company is and may become subject to certain legal proceedings and claims arising in connection with the normal course of its business. In the opinion of management, there are currently no claims that would have a material adverse effect on its consolidated financial position, results of operations or cash flows. On March 5, 2018, the Division of Enforcement of the SEC informed the Company that it is conducting an investigation In the Matter of Trading in the Securities of Longfin Corp. and requested that the Company provide certain documents in connection with its investigation, including documents related to our IPO and other financings and the acquisition of Ziddu.com. The Company is in the process of responding to this document request and will cooperate with the SEC in connection with its investigation. While the SEC is trying to determine whether there have been any violations of the federal securities laws, the investigation does not mean that the SEC has concluded that anyone has violated the law. Also, the investigation does not mean that the SEC has a negative opinion of any person, entity or security.

(Emphasis added).

102. Also on April 2, 2018, *The Wall Street Journal* published an article entitled "Up-and-Down IPO Longfin Is Facing an SEC Probe." This article stated that Longfin had "failed to disclose important information and left a trail of misstatements behind," which ultimately led to

the SEC's investigation. Additionally, the article revealed various misrepresentations regarding Longfin and its financial filings, including the identity of key employees, the extent of operations at its downtown Manhattan principal offices, and even Meenavalli's age. Specifically, the article stated:

> Longfin Corp. LFIN 3.82% took advantage of post-financial-crisis rules designed to create jobs and help young companies go public. But the financial-technology company, which was valued at $5.4 billion as recently as 10 days ago, is now under investigation by the Securities and Exchange Commission after it failed to disclose important information and left a trail of misstatements behind.
>
> Since Longfin's December initial public offering, which raised $5.7 million, the company's price first rose 13-fold, then fell by 80%, all in less than four months. In the run-up to the IPO, the company, which says it operates computer platforms for trading on the Singapore and other stock exchanges, failed to disclose important information and misstated facts as basic as the age of its controlling shareholder, according to a review of securities filings.
>
> On Monday, the company disclosed the SEC probe while also reporting material weaknesses in financial controls. The company, which said it is cooperating with the probe, said it may not be able to continue as a going concern.
>
> The shares closed Monday down 17% at $14.31, above its IPO price of $5.
>
> Longfin went public using a provision of the Jumpstart Our Business Startups Act of 2012, known as Reg A+. The rules allow companies with less than $1 billion in annual sales to bypass some accounting and disclosure requirements imposed on bigger companies, but they do require accurate reporting.
>
> The other nine Reg A+ IPOs that have listed on U.S. exchanges or been issued over the counter have lost more than half their value on average, Dealogic data show.
>
> Concerns about Longfin shine a light on the apparent ease with which IPOs are being approved under the Reg A+ regime, lawyers said. "Everyone understood we were rationalizing the disclosures [required] but nothing as flimsy as what appears to have happened here," said James Cox, a law professor at Duke University. "We're going to look back on Reg A+ and think this was an experiment that didn't get managed very well."
>
> The SEC gave Longfin the green light to sell shares based on one month's audited financial statements, which showed that 96% of the company's expenses were paid to a company controlled by Longfin's owner, Venkat Meenavalli, an Indian entrepreneur. The

company also provided two years of audited statements for a Singaporean subsidiary, which generates most of its revenue.

An SEC spokeswoman declined to comment.

Mr. Meenavalli, who says he controls 90% of Longfin shares, told The Wall Street Journal he is "based out of Dubai" but intends to spend 15 days a month in the U.S. He said its sole U.S. office space—a small room with three desks and no computers in a shared-office building in downtown Manhattan that was deserted at 9:30 on a recent weekday morning—is temporary. Longfin plans to open a bigger office in New York and is hiring more U.S. employees, he added.

Mr. Meenavalli rejects any suggestion of financial misconduct, saying short sellers, who have borrowed and sold short almost 15% of the shares available to trade, according to FactSet, are motivated by greed. "They enter into their own fire," he said.

A tiny portion of Longfin shares were sold in the Dec. 13 IPO. Two days later, Longfin disclosed that its chief financial officer and chief operating officer had resigned just before the offering. But on the same day, the company said it had acquired a crypto company, Ziddu.com, from a company controlled by Mr. Meenavalli.

Longfin shares rose more than 1,200% over the next two sessions to a peak value of $72.38.

Mr. Meenavalli is 48 years old, according to records he confirmed in an interview, although in a May 2017 SEC filing he is listed as 45. Described in that filing as "a financial wizard," his biographies for some earlier companies show him having a computer-science degree from Australia's Suffield University. His Longfin biography lists a diploma in international trade finance from Middlesex University in the U.K.

In SEC filings, Longfin reported it had 20 employees in March 2017. The number dropped to two the following month, rose to 15 in July, fell to three in November and was reported as 18 on Monday. A filing in July 2017 listed Sarah Altahawi, 23, as a New York-based executive. Ms. Altahawi said Monday she is not a company officer, "so that was a mistake."

Her father, Andy Altahawi, said she was a secretary. He was issued 2 million Longfin shares for advising on its IPO, according to filings. He said he "managed the SEC process as a consultant" and didn't act as a banker or underwriter. Mr. Altahawi was listed on Longfin's website as a director until September, when the SEC questioned why he wasn't included in the company's filings.

"I'm not a director…never was—what was online was untrue," he said. Mr. Meenavalli said Mr. Altahawi was an officer for two months but then resigned and declined an invitation to join the board.

> At its peak value, Longfin was included for eight trading days in the Russell 2000 small-company stock index, which would draw in some of the $122 billion in funds that follow the index. Short-sellers said Russell made a mistake because just 1.5% of Longfin's shares traded, below the 5% minimum. Russell said it made the decision based on Longfin's IPO disclosures, which said more shares would trade. Its reversal, announced March 26, sent the shares down 41% the next day.
>
> Mr. Meenavalli told the Journal Friday that the company now has a 7% free float thanks to the unlocking of some IPO shares. Mr. Meenavalli said Russell told him "they are going to include us back."
>
> A spokesman for Russell said Longfin would be assessed like any other company during the next quarterly index update. The spokesman also confirmed that the Journal's calculation, based on available information, that only 4% of the shares are available for trading "is accurate."
>
> Mr. Meenavalli said Longfin "went through a stringent process of [approval by] SEC and Nasdaq" and that its filings are being unfairly judged against the tougher standards set for bigger companies.

103. On this news, the trading price of Longfin's Class A Stock fell from $14.31 per share on April 2, 2018 to close at $9.89 per share on April 3, 2018, a decline of more than 30%, on abnormally large trading volume.

104. Shortly thereafter, on April 6, 2018, the SEC unsealed a civil complaint pending in this Court involving Longfin and announced that it had obtained a court order freezing more than $27 million in trading proceeds from allegedly illegal distributions and sales of restricted Longfin Class A Stock involving the Company, its CEO and three other affiliated individuals. This press release stated, in relevant part:

> According to a complaint unsealed today in federal court in Manhattan, shortly after Longfin began trading on NASDAQ and announced the acquisition of a purported cryptocurrency business, its stock price rose dramatically and its market capitalization exceeded $3 billion. The SEC alleges that Amro Izzelden "Andy" Altahawi, Dorababu Penumarthi, and Suresh Tammineedi then illegally sold large blocks of their restricted Longfin shares to the public while the stock price was highly elevated. Through their sales, Altahawi, Penumarthi, and Tammineedi collectively reaped more than $27 million in profits.

> According to the SEC's complaint, Longfin's founding CEO and controlling shareholder, Venkata Meenavalli, caused the company to issue more than two million unregistered, restricted shares to Altahawi, who was the corporate secretary and a director of Longfin, and tens of thousands of restricted shares to two other affiliated individuals, Penumarthi and Tammineedi, who were allegedly acting as nominees for Meenavalli. The subsequent sales of those restricted shares violated federal securities laws that restrict trading in unregistered shares distributed to company affiliates.
>
> "We acted quickly to prevent more than $27 million in alleged illicit trading profits from being transferred out of the country," said Robert Cohen, Chief of the SEC Enforcement Division's Cyber Unit. "Preventing Defendants from transferring this money offshore will ensure that these funds remain available as the case continues."
>
> The SEC's complaint, which was filed under seal on April 4, charges Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi with violating Section 5 of the Securities Act of 1933. The complaint seeks injunctive relief, disgorgement of ill-gotten gains, and penalties, among other relief.

105. Also on April 6, 2018, NASDAQ announced that trading of Longfin's Class A Stock had been halted in a press release entitled "Nasdaq Halts Longfin Corp." The press release stated:

> The Nasdaq Stock Market® (Nasdaq:NDAQ) announced that trading was halted today in Longfin Corp. (Nasdaq:LFIN) at 10:01:38 Eastern Time for "additional information requested" from the company at a last sale price of $28.189.
>
> Trading will remain halted until Longfin Corp. has fully satisfied Nasdaq's request for additional information.

106. Investors had minimal time to react to the announcement of the SEC action against Longfin and NASDAQ's announcement halting LFIN's trading and, thus, Plaintiff Min was unable to exit his position prior to the halt.

107. After the April 6 trading halt, there was no market for the Company's Class A Stock until May 24, 2018 – when the stock began trading on the OTC and was officially delisted from NASDAQ.

108. When trading resumed on May 24, it opened at a price of $5.05 per share – a price 96.46% lower than the December 18, 2017 high of $142.82, causing economic losses and

damages to Plaintiffs that are actionable under the common law of the State of New York and federal securities laws.

## CONTROL PERSON ALLEGATIONS

109. By reason of the Executive Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Longfin's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors; *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and access to material, non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

110. For example, Defendant Meenavalli is deemed a control person because he, *inter alia*: (a) was Longfin's founder and CEO at all relevant times; (b) controlled over 50% of Longfin's voting equity at all relevant times; (c) personally directed and approved the wrongful actions referenced herein; (d) is personally quoted making false and misleading statements; and (e) enabled the unlawful issuance of Longfin Class A Stock to the December 6 Shareholders.

111. Likewise, Defendant Ratakonda is deemed a control person under the federal securities laws because he, *inter alia*: (a) was the Company's CFO and "Principle Accounting Officer"; (b) personally authorized Meenavalli's self-dealing transactions—such as Longfin's

acquisition of Ziddu.com, which carried a value of $0; and (c) was substantially involved in the unlawful issuance of the December 6 Shares, as evinced by the fact that he and two of his family members were recipients of unlawfully issued shares.

112. Finally, Defendant Altahawi is deemed a control person because he, *inter alia*: (a) managed the Regulation A Offering alongside Meenavalli from the day the Company was incorporated; (b) personally directed the Company's transfer agent to transact unlawful issuances of Longfin Class A Stock; (c) personally directed the Company's transfer agent to transfer 2.5 million Longfin Class A Shares to Meridian Enterprises for the Company's acquisition of Ziddu.com; and (d) was substantially involved with directing the Company's efforts for listing on NASDAQ.

## THE SECURITIES ACT CLAIMS

113. These claims brought under Sections 12(a)(1) and 15 of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o], are based solely on allegations of strict liability.

## COUNT I

### Claim For Violation Of Section 12(a)(1) Of The Securities Act Against All Defendants

114. Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5.

115. Longfin's Class A Stock has never been registered under Section 5 of the Securities Act and thus could only be sold if an exemption from registration applied.

116. Longfin issued the December 6 Shares for $0 in consideration. Because the Company's Regulation A Offering required shares to be sold for $5 per share, the shares issued for $0 were outside of the ambit of the Company's Regulation A Offering, and were thus unregistered at all times.

117. Longfin issued these shares as a result of the Executive Defendants' actions. For example, Meenavalli and Altahawi orchestrated the entire issuance themselves and Ratakonda (as well as two of his family members), Defendants Tammineedi, and Penumarthi were recipients of December 6 Shares. Ratakonda, Tammineedi, and Penumarthi knew their purchases were unlawful by virtue of the fact that the subscription agreements—which they executed—required them to pay $5.00 per share and none of them paid any compensation for the December 6 Shares. Similarly, such issuances would not have occurred but for Network 1's willingness to be paid off, with commissions on non-existent sales, to ignore the fact that the December 6 Shares had not been paid for and therefore, were not made under the Regulation A Offering. Nevertheless, Network 1 is a statutory seller of the December 6 Shares by virtue of the irrefutable facts that: (1) the shares were unregistered; (2) the shares were issued in non-exempt transactions; and (3) Network 1, as underwriter for non-exempt transactions, received financial benefit in the form of commissions.

118. Furthermore, the Company failed to comply with plain language in Regulation A requiring that the Company's actual principal place of business be within the United States or Canada. Stated otherwise, no shares of Longfin Class A Stock were ever properly issued pursuant to the Company's Regulation A Offering, and therefore, these securities do not qualify for the exemption from registration under Regulation A.

119. Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of Sections 5(a) and 5(c) of the Securities Act. These means includes press releases promulgated through the Internet, emails, and the facilities of NASDAQ.

## COUNT II

### Claim For Violation Of Section 15(a) Of The Securities Act Against The Executive Defendants

120. Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

121. Due to their ownership interest in and control over Longfin, and by virtue of their positions as officers and/or directors and participation in and/or awareness of the wrongdoing complained of herein, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making relating to the wrongdoing complained of herein, including the decision to engage in the sale of unregistered securities as set forth herein.

122. By virtue of the foregoing, the Individual Defendants are liable to Plaintiffs as control persons of Longfin under Section 15(a) of the Securities Act.

## THE EXCHANGE ACT CLAIMS

123. Separate and apart from the Securities Act claims, through their Exchange Act Claims, Plaintiffs seek to hold Defendants liable for engaging in a fraudulent and manipulative scheme to create a public market for Longfin's unmarketable securities and artificially inflate the price of Longfin's Class A Stock, as well as for intentionally (or with deliberate recklessness) issuing false and misleading statements and omitting material facts for the purpose of inducing Plaintiffs to purchase Longfin's Class A Stock.

## SCIENTER ALLEGATIONS

124. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements or documents in violation of the federal securities laws. As set forth herein, Defendants, by virtue of their possession of information reflecting the true facts regarding Longfin, their control over, and/or receipt, and/or modification of Longfin's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Longfin, participated in the fraudulent scheme alleged herein.

125. Specifically, the Individual Defendants actually knew and were aware at all relevant times that: (a) Longfin had issued over 400,000 Class A Shares for $0 per share, rather than $5 per share, and thus had issued such stock outside of the ambit of its Regulation A Offering, with such issuances constituting non-exempt transactions in unregistered securities; (b) Longfin's headquarters were not in New York City, but rather were actually in Singapore—where Longfin's largest subsidiary is located; (c) Longfin had falsified key facts in seeking listing of Longfin's Class A Stock on NASDAQ and inclusion of Longfin's Class A Stock in the Russell 2000 index, and actually did not meet the requirements for NASDAQ listing or inclusion in the Russell 2000 index; and (d) the Company's finances were on the brink of collapse and the Company's auditors were preparing to render a going-concern qualification.

126. Each of the Individual Defendants were personally involved in the issuance of the December 6 Shares and manipulative scheme to list Longfin's Class A Stock. For example, Meenavalli and Altahawi orchestrated the entire issuance themselves and Ratakonda (as well as two of his family members), Tammineedi, and Penumarthi were recipients of December 6 Shares. Ratakonda, Tammineedi, and Penumarthi knew their purchases were unlawful by virtue of the fact that the subscription agreements—which they executed—required them to pay $5.00 per share and none of them paid any compensation for the December 6 Shares. Network 1 knew

the December 6 Shares were not properly issued by virtue of the fact that it explicitly questioned whether they were paid for and received documentation that showed the shares were, in fact, not paid for.

127. Each of the Executive Defendants knew that Ziddu.com was worthless and was not a "provider" of blockchain-related "solutions." In fact, it is irrefutable that Meenavalli knew the scope of Ziddu.com's value and operations as he owned 92% of that company prior to its acquisition by Longfin.

128. Each of the Executive Defendants knew that Longfin's headquarters were not in New York City due to their roles managing and directing the Company.

**<u>LOSS CAUSATION</u>**

129. As detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market, as well as a course of conduct that artificially inflated the price of Longfin's securities and operated as a fraud or deceit on Plaintiffs by materially misleading the investing public. Later, as the truth about the misleading statements and omissions which artificially inflated the trading price of Longfin's Class A Stock was laid bare to the market over time, the price of Longfin's securities fell precipitously, as set forth herein. As a result of their purchases of Longfin Class A Shares, Plaintiffs suffered economic losses—*i.e.*, damages—recoverable under the federal securities laws.

**<u>APPLICATION OF PRESUMPTION OF RELIANCE:</u>**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

130. At all relevant times, the market for Longfin securities was an efficient market for the following reasons, among others: (i) Longfin Class A Stock was listed and actively traded on NASDAQ, a highly efficient and automated market; and (ii) Longfin regularly communicated with public investors via established communication mechanisms, including regular

dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

131. As a result of the foregoing, the market for Longfin's Class A Stock promptly digested current information regarding Longfin from all publicly available sources and reflected such information in the Class A Stock's trading price. Under these circumstances, a presumption of reliance applies.

132. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Plaintiffs' claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

133. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Longfin who knew that the statement was false when made.

## COUNT III

### Claim For Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Against All Defendants

134. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

135. This Count is asserted by Plaintiffs against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

136. Defendants carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Longfin's securities; and (iii) cause Plaintiffs to purchase or otherwise acquire Longfin's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

137. Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Longfin's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

138. As a result of their making and/or substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

139. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

140. As a result of Defendants' fraudulent activity, the market price of Longfin's Class A Stock was artificially inflated.

141. In ignorance of the true financial condition of Longfin, Plaintiffs, relying on the integrity of the market and/or on the statements and reports of Longfin containing the misleading information, purchased or otherwise acquired Longfin's securities at artificially inflated prices.

142. Plaintiffs' losses were proximately caused by Defendants' active and primary participation in Longfin's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs purchased Longfin's securities in reliance on the integrity of the market price of these securities, and Defendants manipulated the price of Longfin's securities through their misconduct as described herein. Plaintiffs' losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Longfin.

143. Defendants were aware of material nonpublic information concerning Longfin's fraudulent conduct (including the false and misleading statements described herein). Defendants willfully and knowingly concealed this adverse information, and Plaintiffs' losses were the foreseeable consequence of Defendants' concealment of this information.

144. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases and sales of Longfin's securities.

## COUNT IV

### Violation Of Section 20(a) Of
### The Exchange Act
### Against The Individual Defendants

145. Plaintiffs incorporate by reference and re-allege each and every allegation above as though fully set forth herein.

146. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations, and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof and review of reports and other information provided to them in connection therewith. Because of their possession of such

information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiffs had no access to such information, which was, and remains, solely under the control of the Defendants.

147. The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified, and/or failed to correct those statements in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

148. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Longfin's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Longfin's

corporate releases detailed herein and are therefore responsible and liable for the misrepresentations contained herein.

149. The Individual Defendants acted as controlling persons of Longfin within the meaning of section 20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Longfin to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Longfin and all of its employees. As alleged above, Longfin is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

150. As a direct and proximate result of the wrongful conduct of Longfin and the Individual Defendants, Plaintiffs suffered damages in connection with their respective purchases and sales of the Company's securities.

## COUNT V

**Violation Of Section 20A**
**The Exchange Act**
**Against Defendant Tammineedi**

151. Plaintiffs incorporate by reference and re-allege each and every allegation above as though fully set forth herein.

152. Defendant Tammineedi orchestrated and participated in an unlawful scheme designed to list unregistered Longfin Class A Stock, manipulate its price upwards with the announcement of the Ziddu.com acquisition, and ultimately sell at least 67,000 unregistered, and non-exempt, Longfin Class A Shares on the open market for which Tammineedi obtained a profit of approximately $2.7 million from insider trades.

153. As a direct and proximate result of the wrongful conduct of Defendant Tammineedi, Plaintiffs—who purchased their Class A Shares contemporaneously with Defendant Tammineedi's insider sales—suffered damages.

## THE STATE OF NEW YORK CLAIMS

## COUNT VI

### Violation Of Common Law Fraud
### Against All Defendants

154. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

155. Defendants knowingly made numerous material misrepresentations of fact, and knowingly omitted to state numerous other material facts, of which they had superior knowledge, for the purpose of inducing reliance and action by Plaintiffs.

156. Plaintiffs were not aware of the falsity of Defendants' representations and omissions, since the falsity of Defendants' representations and omissions were non-obvious and not readily discoverable through reasonable investigation.

157. Defendants made these material misrepresentations and omissions with the intent of inducing Plaintiffs to invest in Longfin's securities.

158. Plaintiffs justifiably relied upon Defendants' representations in investing in Longfin's securities. But for Defendants' material misrepresentations and omissions, Plaintiff would not have done so.

159. Plaintiffs have suffered substantial economic damages as a direct result of the misrepresentations of the Defendants' fraudulent conduct, and are therefore entitled to relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A. Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

C. Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

D. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 8, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Lesley F. Portnoy*
Lesley F. Portnoy
Robert I. Harwood
Daniella Quitt
712 5th Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 935-7400
Facsimile: (212) 7533630
Email: rharwood@glancylaw.com
lportnoy@glancylaw.com
dquitt@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiffs*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 8, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 8, 2019.

*s/ Lesley F. Portnoy*
Lesley F. Portnoy